IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DONNA TILSON,

     Plaintiff,

v.                                                       CASE NO. 1:15-cv-103-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability and disability insurance benefits (DIB). (ECF No. 1.)  The Commissioner has answered, and both parties have filed briefs outlining their respective positions. (ECF Nos. 9, 12, & 13.)   For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for disability and DIB in October 2011, alleging a disability onset date of July 1, 2010, due to back injury,

osteoporosis, degenerative disc disease, scoliosis, and thoracic disc problems.  (R. 151-57.)  After denials at the initial application and reconsideration stages, Plaintiff petitioned for a hearing before a Administrative Law Judge (ALJ) Kelley Fitzgerald, who conducted a hearing on August 16, 2013.   (R. 25.)  The ALJ entered an unfavorable decision on September 25, 2013.  (R. 25-31.) The Appeals Council denied Plaintiff's request for review, thus making the decision of the ALJ the final decision of the Commissioner.  (R. 1-4.)  This appeal followed.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be

---

[3] *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] *Keeton v. Dep't Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to last for a continuous period of not less than twelve months.[6]

The impairment must be severe, making Plaintiff unable to do his previous

work, or any other substantial gainful activity which exists in the national

economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]

First, if a claimant is working at a substantial gainful activity, he is not

disabled.[9]   Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled.[10]   Third, if a claimant's impairments meet

or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1, he is disabled.[11]   Fourth, if a claimant's impairments do not prevent him

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's

impairments (considering his residual functional capacity ("RFC"), age,

education, and past work) prevent him from doing other work that exists in

the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff.[14]  The burden then temporarily

shifts to the Commissioner to demonstrate that "other work" which the

claimant can perform currently exists in the national economy.[15]  The

Commissioner may satisfy this burden by pointing to the Medical-

Vocational Guidelines (the "Grids") for a conclusive determination that a

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] *Doughty*, 245 F.3d at 1278 n.2. In *Doughty* the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such

---

[16] *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] *Walker*, 826 F.2d at 1003.

[19] *Wolfe*, 86 F.3d at 1077-78.

evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff provided records from a 2001 whole body bone scan and MRI of her cervical spine, for her history of mid back pain and leg pain. The results of the bone scan showed a "suggestion"[21] of increased activity in her mid to lower thoracic spine at the T8 level.  The MRI showed disc space narrowing and cervical spondylosis at the C3-4 level (with significant narrowing of the anterior thecal sac), mild cervical spondylosis at C4-5 and C5-6, neural foraminal narrowing at C5-6 on the right from degenerative change. The impression stated that the cervical spinal cord was normal with no disc protrusion.  X-rays showed scoliosis and discogenic disease and degenerative changes.  (R. 225-28.)

In June 2009, Plaintiff fell from a ten foot ladder and immediately

---

[20] *See id.*

[21]The report noted that sometimes a minor degree of variable activity was present in that region related to a different degree of attenuation as a normal variant.

experienced severe low back pain, which made it "impossible for her to move."  She was hospitalized from June 2, 2009 to June 6, 2009.  She was evaluated at the emergency room of North Florida Regional Medical Center and taken to the orthopedic floor of the hospital.  A CT scan of her spine showed that she had a L1 burst fracture[22] with 30% canal compromise and mild kyphotic[23] changes.  Due to the pain, Plainitff only had a limited range of motion of her back, and her pain worsened with left leg movements.  X-rays of her ankle were performed but did not evidence an acute fracture.  She was given take home pain medications, including Motrin 800 mgs and Vicodin 5 mgs. (R. 231-44.)

Dr. Steven Bailey examined Plaintiff while she was hospitalized for the burst fracture.  He found that Plaintiff had tenderness in her lumbar region, particularly in the thoracolumbar junction, and mild palpable deformity.  Plaintiff was fitted with a TLSO brace and was sent to Physical Therapy for evaluation and treatment.  She was also given a fracture boot

---

[22] A burst fracture is different from a compression fracture in that it is associated with trauma and a breaking of the vertebra.  Burst fractures are often more severe than compression fractures.  https://en.wikipedia.org/wiki/Burst_fracture

[23] Kyphosis refers to an "exaggerated rounding of the back." http://www.mayoclinic.org/diseases-conditions/kyphosis/basics/definition/con-20026732

for her left ankle, which was sprained. (R. 231-44.)

Plaintiff followed up with Dr. Bailey several times after her release from the hospital after her fall. The first appointment was on June 22, 2009. Dr. Bailey observed some tenderness in Plaintiff's lumbar region and limping on the left, due to her boot. Dr. Bailey recommended that Plaintiff perform gentle stretching. Dr. Bailey weaned Plaintiff off Oxycontin and prescribed Percocet and Flexeril to reduce Plaintiff's pain.

The next month, July 2009, Dr. Bailey examined Plaintiff and found minimal tenderness with palpation. He observed that Plaintiff was ambulating well. Dr. Bailey allowed Plaintiff to use a riding lawn mower for thirty minutes and told her to follow up in four months. He prescribed Flexeril and Percocet.

Plaintiff had x-rays of her lumbar spine in July 2009 that evidenced a Grade II 50% wedge fracture in the superior endplate of L1, mild kyphoscoliosis, minimal central canal stenosis from the posterior bulge of the wall, a fracture that did not extend into the pedicles and without evidence of facet diastasis, and mild lower lumbar degenerative disease and facet arthropathy. (R. 263.)

At her followup with Dr. Bailey in August 2009, Plaintiff's pain had improved somewhat but Plaintiff was still wearing her back brace.  Plaintiff reported that riding the lawn mower was jarring and that she could not do it.  Dr. Bailey observed tenderness over Plaintiff's mid back with palpation and that Plaintiff was walking slowly but steadily.  Dr. Bailey recommended that she wear the brace for another month.

In September 2009, Plaintiff returned and stated that her back pain had improved.  Dr. Bailey told Plaintiff to discontinue use of the brace, and advised her to speak with her primary care physician about her osteoporosis.

Plaintiff returned to Dr. Bailey in October 2009 with back pain and difficulty sleeping.  Dr. Bailey observed scoliosis secondary to muscle spasms.  Plaintiff's L1 had collapsed but she did not have deformity at the time.  Plaintiff was told to decrease Motrin intake to three times daily. Dr. Bailey prescribed Norco and Flexeril.

Plaintiff's next appointment was in January 2010 due to daily pain in her lower left back.  She reported that she was in school for medical coding and billing.  Dr. Bailey examined her and found tenderness in her left

lumbar spine and over the L1-L2 area.  She was prescribed Norco and Flexeril. (R. 265-70.)

In 2012, Plaintiff saw Dr. Robert A. Greenberg for a consultative examination.  Plaintiff reported that she was in a motor vehicle accident in 1998 where she injured her neck and right shoulder and that she has experienced chronic pain in those areas since then.  She also reported injuring her thoracic spine in 2001 through heavy lifting and injuring her lumbar spine in June 2009 after her fall from a ladder.  Since that date, Plaintiff has had constant low back pain that radiates into her right leg.  She told Dr. Greenberg that she had difficulty bending and lifting and stated that she could not sit for longer than one and a half to two hours.

Dr. Greenberg's examination revealed decreased range of motion of the cervical spine, lumbar spine, right hip, and right shoulder.  Plaintiff had pain on range of motion of her cervical spine, lumbar spine, right hip, and right shoulder.   She had a mild limp in her right leg but could walk without an assisting device.  Dr. Greenberg noted Plaintiff's difficulty tandem walking and difficulty walking on her heels and toes and stooping.  Plaintiff also exhibited decreased right grip strength and right arm strength,

measuring 4/5.  Her straight leg raise tests were positive bilaterally at 30

degrees.  Dr. Greenberg's impression was osteoarthritis of the cervical

spine, right shoulder, right hip, and lumbar spine due to her previous

injuries.  (R. 249-50.)

Plaintiff had imaging of her lumbar spine in January of 2012.  The

results showed an anterior wedge compression fracture at L1 and mild

degenerative spondylsosis at L5-S1.  It was noted that the appearance

was unchanged from her prior CT scan in June 2009.   R. 247.)

Plaintiff returned to Dr. Bailey in April 2012 due to her ongoing pain.

Plaintiff stated that she did not have insurance to seek treatment.  She

limped when walking, favoring her right side. Dr. Bailey told Plaintiff that

she needed studies performed on her lumbar spine, including a CT scan

and MRI, to evaluate her problem. Plaintiff told Dr. Bailey that she could

not afford it.  Dr. Bailey provided Plaintiff with Percocet and Flexeril.  (R.

257.)

Plaintiff went to Dr. Bailey in March 2013.  Recently Plaintiff had

visited the emergency room because she had slipped and landed on her

right side.  The fall caused a slight increase in right leg pain, but the pain

did not radiate past her buttock.  Upon examination, Plaintiff exhibited tenderness to palpation in her thoracic and lumbosacral spine, and she had abnormalities of the lumbosacral spine.  Her straight leg raising tests were negative.  Dr. Bailey counseled Plaintiff on her general health, including her need to quit smoking and seeing an orthopaedic surgeon. Plaintiff replied that she could not afford treatment, and Dr. Bailey gave her information on health clinics, Medicaid, and vocational rehabilitation.  He prescribed Percocet and Cyclobenzaprine.  (R. 254-56.)

Plaintiff returned to Dr. Bailey in July 2013.  Plaintiff requested follow-up for central thoracic pain and upper lumbar pain.  Plaintiff also complained of pain radiating into her legs intermittently on the right side, along with neck, knee, and ankle pain.  She stated that any movement exacerbated her back pain and lower extremity pain.

Dr. Bailey observed that Plaintiff walked with a flexed posture and had tenderness to palpation of her cervical, thoracic, and lumbar region, in her knees bilaterally and ankles bilaterally, and tenderness in her buttock bilaterally.  Plaintiff's range of motion was restricted in all planes.  Dr. Bailey stated that Plaintiff had underlying kyphoscoliosis and walked slowly

with flex posture.  Dr. Bailey described Plaintiff's condition as a "very difficult situation" and opined that he did not see any way Plaintiff could be gainfully employed.  Dr. Bailey gave Plaintiff a final prescription for Flexeril and Norco and told her he would see her as needed.  (R. 252-53.)

Dr. Bailey completed a physical medical source statement in July 2013.  In the medical source statement Dr. Bailey opined that Plaintiff could sit 45 minutes before getting up, stand 30 minutes before needing to sit or walk, and walk 1 city block without rest or severe pain.  According to Dr. Bailey, Plaintiff could only sit for two hours of an eight hour work day and stand for two hours of an eight hour work day.  Dr. Bailey stated that Plaintiff would have to walk around for five to ten minutes every half hour and that she could rarely twist, stoop, bend, crouch, and squat.  He opined that she could lift and carry up to 10 pounds occasionally and up to 20 pounds rarely.  (R. 258-61.)

## B.  Hearing Testimony

Plaintiff testified that she had graduated high school and had taken a computer course in medical coding and billing.  Her previous work consisted of paying medical claims for an insurance company, entering

data, auditing, and bartending.  She currently lives with her brother on a ten acre property.  She helps her brother feed and water his peacocks and emus, but she cannot clean their pens.  She uses a tray on wheels to bring feed to the bird.  She tries to help rake, paint, and cut the grass on the property.

Plaintiff's disability onset date was listed as July 1, 2010.  Plaintiff testified that she chose that date because her pain was getting progressively worse.  Plaintiff said that she saw Dr. Bailey "on and off" around that time, but could not see him as frequently as she would have liked because she did not have health insurance.

Plaintiff testified that she sometimes used a cane when she had shooting pains down her leg, which was a few times a month.  The cane was not prescribed.  Plaintiff testified that she cannot sit for long periods of time without getting up, and gave the example of being unable to sit through an hour long television show.  She also stated that she could not walk for a long period of time.  She testified that her pain was "controlling [her] life."  (R. 37-65.)

## C. Findings of the ALJ

The ALJ found that Plaintiff had the severe impairments of disorders of the spine and osteoarthritis, but that the impairments—either singly or in combination—did not meet or medically equal the severity of a listed impairment.  The ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work, with the additional limitations that Plaintiff only frequently climb ramps/stairs, stoop, kneel and crouch.  The ALJ also limited Plaintiff to occasional crawling and climbing ladders, ropes and scaffolds, and limited her from concentrated exposure to extreme cold.  Based on this RFC, the ALJ concluded that Plaintiff could perform her past relevant work as a data entry clerk, claims clerk, and claims examiner.  (R. 25-31.)

## IV.  DISCUSSION

Plaintiff contends that the ALJ erred by improperly discounting Dr. Bailey's opinion that Plaintiff could not work.  The opinion at issue is the physical medical source statement in which Dr. Bailey opined that Plaintiff could not remain sitting for more than two hours during an eight hour work day.  Dr. Bailey also stated that Plaintiff could sit for a maximum of 45

minutes at one time, and could stand for a maximum of 30 minutes at one

time.  Dr. Bailey also concluded that Plaintiff could not stand for more than

two hours during an eight hour work day, and could only walk the

equivalent of one block without pain.  He further found that Plaintiff could

occasionally life up to ten pounds, could rarely twist, stoop, crouch/squat,

and never climb stairs and ladders.  Dr. Bailey also opined that Plaintiff had

significant limitations with reaching, handling, or fingering with her right

hand, and that she would be absent from work more than four days per

month.  (R. 258-61.)

The ALJ summarily rejected Dr. Bailey's opinion, and wrote:

> "As for the opinion evidence, no significant weight is
> given to Dr. Bailey's opinions through the date last
> insured as they are not supported by his treatment
> records.  His March 2013 treatment notes, almost 3
> months after the date last insured expired, document
> no significant abnormalities.  At that time, the claimant
> reported that she had an increase in pain after
> slipping a week earlier.  While she had tenderness to
> palpation, straight leg raises were negative, and she
> had normal sensation and motor strength.  Dr. Bailey
> restrict [the] claimant to sitting no more than 2 hours
> in an 8 hours workday, but there was no indication
> this was discussed at any time through the claimant's
> date last insured.   Given the relatively benign
> findings, Dr. Bailey's opinions [sic] the claimant
> cannot perform even a reduced range of sedentary
> work is given little to no weight."

(R. 30.)

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[24]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[25]

While there is no requirement for the ALJ to discuss every medical record in the administrative record, he is "required to state with particularity the weight he gave the different medical opinions and the reasons therefor."[26]  Additionally, because an ALJ is not permitted to substitute his

---

[24] *Crawford v. Commissioner of Social Security*, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  *See also Edwards v. Sullivan*, 937 F.2d 580, 583-584 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[25] 20 C.F.R. § 404.1527(d)(2).

[26] *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990)(noting "the ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence").

judgment for that of the medical experts,[27] the ALJ cannot reject portions of a medical opinion without providing an explanation for such a decision.[28] Where an ALJ fails to sufficiently explain how he reached his decision, the Court may not speculate.[29]

To demonstrate good cause for assigning little to no weight to Dr. Bailey's opinion, the ALJ stated that Dr. Bailey's treatment records do not support his opinion that Plaintiff cannot sit more than two hours in a work day.  The ALJ specifically referenced Dr. Bailey's March 2013 examination, in which Dr. Bailey observed no abnormalities and which showed that Plaintiff's straight leg test was negative, and that Plaintiff had normal sensation and motor strength.

The fundamental problem with the ALJ's assessment, however, is that the ALJ impermissibly focused on only one of Dr. Bailey's treatment records and ignored the totality of Dr. Bailey's extensive other records regarding Plaintiff's treatment.  Dr. Bailey's progress notes reveal that he consistently observed tenderness to palpation across Plaintiff's back, and

---

[27] *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982).

[28] *Morrison v. Barnhart*, 278 F. Supp. 2d 1331, 1337 (M.D. Fla. 2003).

[29] *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).

frequently noted that Plaintiff had pain radiating into her right leg.  Dr. Bailey instructed Plaintiff to wear a TLSO brace for several months after her fall.  He also found abnormalities of Plaintiff's lumbosacral spine in 2013.  Further, Dr. Bailey's records of his treatment and examination disclose that Dr. Bailey found that Plaintiff had a restricted range of motion on all planes and suffered from an underlying kyphoscoliosis.

Dr. Bailey's treatment records reflect that he repeatedly encouraged Plaintiff to seek orthopedic treatment, despite Plaintiff's explanation that she could not afford to pay for the treatment.  Recognizing that Plaintiff had serious pain issues and could not afford further treatment, Dr. Bailey provided Plaintiff with pain medication on several occasions.

During Plaintiff's last visit, Dr. Bailey characterized Plaintiff's situation as "very difficult" and stated that he did not see any way that Plaintiff could be gainfully employed.

Thus, a review of the totality of Dr. Bailey's treatment records—as opposed to records of just one of the visits—reflects much more than benign findings, as the ALJ stated, and fully support Dr. Bailey's opinions in his medical source statement.  Dr. Bailey's treatment records reflect that he consistently prescribed pain medication, encouraged Plaintiff to seek

orthopedic treatment, and consistently found on examination tenderness in Plaintiff's back and restricted range of motion.  In short, the ALJ's conclusion that Dr. Bailey's treatment records are at odds with his opinion that Plaintiff could not work is not supported by substantial evidence.

The ALJ further erred by failing to recognize that Dr. Greenberg's consultative examination was consistent with Dr. Bailey's opinion.  Dr. Greenberg found that Plaintiff had decreased range of motion of the cervical spine, lumbar spine, right hip, and right shoulder and pain on range of motion of the same areas.  Dr. Greenberg also found that Plaintiff had difficulty tandem walking and walking on her heels and toes and stooping.  Plaintiff's straight leg raise tests were positive bilaterally at 30 degrees.  Further, Dr. Greenberg also found that Plaintiff had decreased right grip strength and right arm strength.  Lastly, Dr. Greenberg assessed Plaintiff with osteoarthritis based on the examination.

In discounting Dr. Bailey's opinion the ALJ also said she was giving the opinion little weight because, while Dr. Bailey opined in her medical source statement that Plaintiff was limited to sitting no more than two hours in an eight hour work day, there was nothing in the records evidencing that he discussed this with Plaintiff prior to the claimant's date last insured.

Plaintiff's date last insured was December 31, 2012. Dr. Bailey did not complete the statement until July 2013. The mere fact that the medical statement post dated the date last insured, however, standing alone is not sufficient to discount the opinion. Rather, a post-insured-date opinion from a physician that the claimant suffered a disabling condition prior to the insured date is accepted when the opinion is consistent with pre-insured-date medical evidence. *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 832 (11th Cir. 2011).

As discussed above, throughout Dr. Bailey's treatment records of Plaintiff during the insured period Dr. Bailey consistently noted Plaintiff's back and leg pain, kyphoscoliosis, and continually recommended that Plaintiff seek orthopedic treatment.  And as discussed above, Dr. Bailey's opinion is fully in line with Dr. Greenberg's findings that Plaintiff exhibited restricted range of motion and pain on range of motion, and that Plaintiff had positive straight leg tests.

Accordingly, for these reasons, the Court concludes that the ALJ's reasons for discounting the opinion of Dr. Bailey, Plaintiff's treating physician, are not supported by substantial evidence.  The case therefore should be remanded for the ALJ to consider the totality of Dr. Bailey's

treatment records in assessing the proper weight to be given to Dr. Bailey's opinion.[30]

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner so that the Administrative Law Judge may conduct further proceedings consistent with this report and recommendation.

**IN CHAMBERS** at Gainesville, Florida this 31st  day of May 2016.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.

---

[30] Because the issue of Plaintiff's RFC necessarily will be revisited upon remand, including issues regarding the credibility of Plaintiff's complaints of disabling pain, it is unnecessary to address Plaintiff's remaining argument in this appeal challenging the ALJ's credibility assessment.